May it please the Court, Miriam Hubbard representing Appellant Michael Mead. The question in this case is whether Mr. Mead's takings case is ripe, given that he seeks only equitable relief. Two cases control, Nolan v. California Coastal Commission and Dolan v. City of Tigard. Both of those cases demonstrate that prospective relief is a proper remedy in an exactions case, which must be brought at the time a condition is imposed, whether or not damages have been experienced by the property owner. Neither Mr. Nolan nor Mrs. Dolan dedicated any property before seeking to have the conditions on their property ruled unconstitutional. As a matter of fact, Justice Stevens, in the dissent in Dolan, noted that he thought the case was premature because no taking had occurred, thus no violation of the Just Compensation Clause. There are many problems, it seems to me, but one of them is that Nolan and Dolan actually don't even address this question. I mean, as far as I can tell, what was really happening there, those cases came out of State court, right? Yes, Your Honor. And the whole system was essentially one that said, we're not going to pay you, because that was the whole process there. The process was, in order to get the permit, you have to give us some land, right? Correct. And they went to State court to challenge that, and if the answer was, well, fine, but we'll give you some money, that would have been the answer. So nobody saw the case as one in which they, the compensation possibility hadn't been exhausted. Nobody, it's not discussed in the cases, in the opinions at all. Well, Your Honor, it's not, because no damages had been incurred. In fact, in the Dolan case, after it was decided by the U.S. Supreme Court, it did go back for, it was remanded to the trial court to figure out what the proper compensation was. I guess what I'm saying is this. The premise of those opinions was, if they had taken the property directly, you would have had to pay for it. Because they were taking it, they were getting it on an adjudicatory basis in exchange for a permit, they were trying not to pay for it. So the whole premise was they weren't going to pay for it. So the possibility of paying for it had been exhausted. The whole premise on which the cases were decided was that the state, the county is not going to pay for it. Well, Your Honor, I think the answer to that is that this was a novel takings claim at that time. Several justices noted that this, the Nolan case in particular, was different than all of the other takings claims and it didn't really fit into the takings jurisdiction at that time. The Court decided that, yes, if the government wants to impose a condition on a development permit. Well, a land use, a land conveyance condition is what the case is about, both cases. Well, it is, Your Honor, but since the Court did in fact establish a new takings test, the test should be more broadly interpreted than the facts of those cases. In fact, the tests in Lucas and at Penn Central are not as tightly hinged to the facts of those cases. Let me ask you this about the whole Nolan-Dolan context. So even if I said, well, this is analogous to Nolan because, at least with respect to the mitigation property, because in order to get their permit, they have to fallow or set aside the .9 acres. But then the condition also allows them to mitigate by paying a fee. I think it's the same thing for the affordable housing. So if there's no either express taking or dedication requirement, and there's no implied requirement because you could get out from under it by paying a fee, how does this fit in, then, to the Nolan-Dolan framework, where there was no, so far as I remember from the cases, there was no fee option? The Nolan-Dolan framework should apply whenever a condition is imposed on development in order to mitigate a harm created by the development. In other words, it's ---- Is that true if there's a fee? Because the impact fee cases seem to all be analyzed under Penn Central. Is there an impact fee case that used the Nolan-Dolan framework? Well, let me first address the Penn Central application. I believe this happened in only one case, and that would be McClung v. City of Sumner. In that case, and in footnote 3, what the court says is, yes, this is a legislatively imposed condition, and it is intended to mitigate flooding, which has been well documented. And so in this case, we are going to apply Penn Central, because it's been well documented, it's legislatively imposed. I don't understand that. Why isn't McClung just dispositive of your argument? You're arguing essentially that it meets the Nolan-Dolan test, but that isn't what the opinion says. The opinion doesn't say we're applying Nolan-Dolan and this survives it. It says the whole framework doesn't apply. Your Honor, it says in this particular case. It says in a case where it's not so clear that the exaction that is imposed on property is as closely related to the condition it's to mitigate, then it doesn't apply. It doesn't say that. It says we are not confronted with a legislative development condition designed to advance a wholly unrelated interest. That's what it says. It says that. And it says in a case where that is not the situation, where the mitigation is not so clear, it says we don't decide whether Penn Central and Nolan-Dolan would apply. It's a wholly unrelated interest. And here we argue that this is a wholly unrelated interest. The tiger salamanders are a wholly unrelated interest? Well, in this context, because this is not the property is not in, it is a certain distance from a known breeding ground. But you're getting into Fish and Wildlife Service, Endangered Species Act territory. I mean, so the question is are you taking habitat, so would you be liable for penalties under the Endangered Species Act? And so the city or the local government in trying to comply with CEQA says, well, some mitigation is required. So, I mean, that really goes to an underlying issue of Endangered Species Act law. But clearly there's a relationship between developing on a property that's within however much, whatever distance of the California tiger salamander breeding ground. So the question is whether it's required under the Endangered Species Act or not. Or whether it's closely enough related to the impact of this development. Yeah, but all I'm pointing out is that this footnote, do you agree that McClung but for that footnote essentially does in your case by saying that it has to be an adjudicative rather than legislative decision and that exactions of this kind just don't count? Sure. If it decides that only, that no and do not apply to legislatively imposed exactions. So you're basically dealing with the footnote. And the footnote says wholly unrelated. It doesn't say not sufficiently related or not closely related or anything like that. It says wholly unrelated. You're right. And we argue that these are unrelated. That the sufficient nexus is not there. And, yes, there are cases that say there's a split of authority throughout the country saying that no and do not apply to legislatively imposed exactions. That is true. However, neither Nolan nor Dolan specifically said that. And the conditions in those cases were not unique to those cases. But that doesn't matter because we're on a panel of the Ninth Circuit and McClung is a case of the Ninth Circuit and so we're bound by it. I understand. But I think McClung can be distinguished because McClung, you have a clear and proven connection. You have an area where flooding has occurred and it's very clear that you need larger pipes. In this case, you have a much more amorphous connection. You have an affordable housing condition which the government has not demonstrated is sufficiently related to this development of four duplexes. And you also have the tiger salamander condition where Mr. Mead's expert has said, no, there are no tiger salamanders there. And where the Fish and Wildlife Service says, well, there could be. And the fact that you have this program that says if it's a certain amount of distance from a known breeding ground, then, yes, you have to dedicate property or pay a fee. What about the Lingon case? I'm sorry? What about the Lingon case and its indication that Nolan and Dolan are quite limited and limited in particular to land use exactions, which this is not one of? Well, Your Honor, Lingon, that was not the question presented in the case. And, yes, I mean, they looked at whether the substantial advances legitimate government interest case is a takings case or due process case. They said it's a due process case. Then they went on to describe the existing takings cases. I don't know. That was not an issue in the case. So I believe that that is dicta. And I think what they said, they were trying to give kind of general notions about what the various takings tests are. So we should ignore it? Well, no. But I don't think, Your Honor, I don't think that the court was laying out the parameters for each of the tests in detail. And, in fact, the court never has laid out the ---- What is an adjudicative land use exaction? And why in Nolan and Dolan was it adjudicative? It wasn't imposed by the court, correct? Well, Your Honor, that's a very good question in the local government context, because local governments do perform legislative and adjudicative functions. Generally, what people are talking about with legislative is whether it's imposed by ordinance or administrative regulation, whereas when they're talking about adjudicative, they're talking about one person standing before a city council, where the council comes up with a condition that is not set out in an ordinance. But why wasn't this adjudicative? It was applying a mitigation requirement from an interim guidance through CEQA on an individual piece of property. What makes this legislative and not adjudicative? Well, this is legislative and adjudicative in the same way that Nolan was. We have an overriding ordinance, and then we have it applied to a particular piece of property. In Nolan, for instance, there was an administrative regulation that said we are going to take these easements from properties. And in fact, every application after that ordinance was adopted, they imposed an easement except for three, which were not beachfront properties. So there is the overriding regulation, but then there's also the application of it to a particular property. And in some factual situations, it's not going to be closely related or sufficiently related under Nolan-Dolan. So in this case, it was an individual determination that this property could not develop unless it put aside a certain amount of property that it could not develop. So the government didn't ask for an easement for dedication, but in effect, it said this property must be left in its current state, which is fairly close to being an easement, I would think. Is that right? Is that what happened in your case? No. In this case, what the government said is that you can develop your project as you desire to do to build these four duplexes. But if you want to do so, you've got to provide affordable housing and you've got to provide habitat for the California tiger salamander. So not on that particular property. It could have been off-site habitat or you could have paid a fee, a mitigation fee. Correct. There were a number of alternatives. And that leads me to the question of why this is sufficiently final under Prong 1 of Williamson. We kind of don't know what we're dealing with here because you've never made an election as to what it is you would do, and we don't know the consequences. We don't know how much money we're talking about. We don't know how much property we're talking about. I believe there are waivers available under either of these provisions that you could have sought. So is that correct, by the way? Well, we did request that they waive the conditions, and that was denied. But regardless of the method, and this raises the whole issue of the fact that we have to challenge this at a particular time in order to stay within the statute of limitations and the accrual of the statute of limitations, yet it's before the development is pursued. Mr. Mead has not begun the development. The city has said, well, the amount of money you pay, we need to wait until the project is built and the units are sold in order to know it's based on the sales price of the units. So these cases, this is why we argue that these kinds of cases have to be brought with seeing they have to be brought prospectively, because otherwise the statute of limitations will run. There are additional problems that if you go ahead and build the project and then you try to challenge it, there's a body of law that says, no, you've waived your right because you've taken advantage of the government, the permit that the government has given you without challenging the conditions first. So you're really in a box here, and this is not uncommon, where the property owner has to go ahead and challenge before building the project, and oftentimes the conditions can't be finalized to a precise dollar amount. Now, we know how much property Mr. Mead would have to dedicate. He would have to dedicate two units of the eight units to affordable housing, and he would have to dedicate .9 tenths of an acre, well, almost one acre. He doesn't have to dedicate. With regard to the housing, it's not dedicating.  He can buy, build and sell or rent the housing, but it's just going to be for lower middle income people, and so maybe, but we don't even know that, at a lower rate. Yes, Your Honor. It would be for low income people. It would be affordable housing. He could either build the two units on site. But it's not dedicating anything, is what I'm trying to say. You're not handing anything over to anybody, including to the tenants. Okay. Correct. But the, I mean, the language that is used is that they dedicate two units to affordable housing. So you're right. They're not dedicating it in the sense of an easement. But that's important to the measure of whether there's any taking problem here, because all it means is that the property perhaps will be worth less. It's like a zoning ordinance. It basically says all you can build here is housing of a certain kind, not housing of another kind. Well, Your Honor, this is not like the normal restrictions on development that go to, like, aesthetic concerns and things like, you know, setbacks and height restrictions. This is something that the government could not come up to Mr. Meade and say, we need you to dedicate two units of affordable housing to your community. So then the question becomes, well, you know, can government do it through a building permit? And the answer is yes. Could they do it through zoning? Excuse me? Could they do it through zoning? Could they say that in this area you can only build affordable housing? Oh, sure they could. But they haven't. Okay. So I'm not really seeing the difference. In Taken's terms, I'm not seeing the difference. Well, Your Honor, zoning conditions don't generally come under Nolan and Dolan. I understand that. I want to know why this should, because I don't see the difference. Well, because there's no area that's been zoned for affordable housing. It's not a zoning. This is a specific condition imposed on a single landowner, correct? Yes, it is. And it's imposed by ordinance on new development. So the question is, should new development have to bear the burden of providing this public benefit? Or is it more appropriately handled through taxes or other methods? We're not saying the city can't provide affordable housing in any sense of the word. This is not substantive due process where we're saying that, you know, it doesn't further the interest or that it's not a legitimate interest. What we're saying is it's not something that should be provided by new development. It should be handled in other ways. Okay. You're over your time. We'll give you a couple minutes for rebuttal. Thank you. Thank you, Your Honor. Thank you, Your Honor. If it pleases the Court, my name is Alan Brabender and I represent the U.S. Fish and Wildlife Service. I am joined at the appellate table today by attorneys for the City of Cotati and the State of California. I see one person there. He's behind me. I intend to use the first seven minutes and then yield the remaining time to the city and State. And as part of my presentation, I have one basic point which I think this Court understands, and that is that this Court lacks jurisdiction over the claims against the service because Mr. Ymise seeks only equitable relief as opposed to just compensation. In Bayview, Vietnam, this Court held that it lacks jurisdiction over a Fifth Amendment takings claim seeking equitable relief where there is a Tucker Act monetary remedy available. And Bayview broke no new ground. The Supreme Court has also held in cases like Ruckelshaus and Riverside Bayview homes that Federal courts lack jurisdiction over claims seeking equitable relief where a Tucker Act remedy is available. And here If they, the Meads, develop the property, are they violating the Endangered Species Act? In other words, is there a taking of habitat, or is there some, are they harassing the critters? Or is this just prudential, the interim mitigation guidelines in this case? Well, liability would flow under the Endangered Species Act only if the development would result in the actual take of an endangered species. And we don't know that until the development actually occurs. Okay. So there's no requirements that the guidelines didn't impose a legal requirement. They don't say if you don't mitigate, then there's a violation of the Endangered Species Act.  This is just for the city's CEQA. The city is using it for its CEQA compliance. Is that correct? That's exactly right. No legal consequences flow from the guidelines whatsoever. You do not incur liability for failing to follow the guidelines, and you do not get protection from the ESA if you follow the guidelines. No legal consequences flow whatsoever. Okay. So it's not a safe harbor. No. Okay. No, it's not. Going back to my point, though, while we don't believe Mr. Mead has a meritorious takings claim, there is a Tucker Act remedy available to him, so this Court lacks jurisdiction. And nothing in Dolan or Nolan should cause this Court to question its well-supported holdings in Bayview. And you're also arguing that the guidelines are not, because of their character, are not challengeable under the APA if that's what they're trying to do. That is right. There is no valid waiver of sovereign immunity in this case, which is a reason why this Court lacks jurisdiction. Questions of sovereign immunity turn on the release sought. If a plaintiff seeks just compensation or a monetary remedy, the Fifth Amendment provides what courts have called a self-executing waiver of sovereign immunity because the monetary relief is specifically provided by the Constitution. If, however, a plaintiff seeks equitable relief, he cannot rely on the self-executing waiver in the Fifth Amendment because the Fifth Amendment says nothing about equitable relief, and waivers of sovereign immunity cannot be implied. They must be expressed. So if Mr. Mead desires equitable relief, he must establish a valid waiver of sovereign immunity. But his complaint does not allege there to be a waiver of sovereign immunity. His jurisdictional statement in his opening brief does not say anything about a waiver of sovereign immunity. And it's not until the reply brief that, for the first time, we learn that he believes that he has an APA claim. Why isn't the mitigation requirements then wholly unrelated to the development if you're saying the Endangered Species Act doesn't require them and you don't get any safe harbor if you comply with them and you just invented them and put them out in the world? Why isn't the city's requirement that the Meads comply with the guidelines unrelated to any development project? Well, the city included the mitigation to comply with the California Environmental Quality Act. And it is my understanding, this is probably a better address by the city, but it is if the city did not include the guideline or include the mitigation in the permit, it would have to prepare an environmental impact report under CEQA. And that is the reason why the mitigation is included. But they would only have to do that if, in fact, the development would have some impact on the environment, and you're not you're saying that you don't know that that's the case with your guidelines. You don't establish that that's the case. Well, I mean, we don't know either way. There still could be a significant impact because they are saying you're not you're not CEQA. CEQA is a separate statute. And your understanding is that there is some matter in which CEQA would require the city if these guidelines weren't complied with. With that regard to whether there's an actual impact to prepare an environmental impact statement, which is supposed to figure out if there is an impact. That's right. That's basically what's going on. Well, I think under CEQA, and again, I don't know much about CEQA. If there's potential significant effects, I believe, then you have to prepare. Okay. You probably would like your colleague to stand up now. Okay. Thank you. Thank you. Good morning, Your Honors. Dawn McIntosh with Myers-Navet for the City of Cotati. Essentially, I think what you've heard here is that the appellant is asking this court to do three things, all of which contravene established Supreme Court jurisprudence, your case law, and the Fifth Amendment takings laws itself. First thing they're asking this court to do is to decide the takings issue without requiring the rightness doctrine to be fulfilled. Second thing they're asking this court to do is decide that the government does not have the right to take private property for public use, even if it pays just compensation. They're asking this court instead to enjoin such activity. Well, that's the same thing. Exactly. One and two are the same. So go ahead. All right. As I understand it. Well, the rightness and then the second one. The third one that they're asking this court to do is to take the Nolan-Dolan framework, which has been applied only to very limited situations, and broadly apply it to all regulatory takings cases. Well, Nolan and Dolan didn't require the owners, the property owners, to go through the State remedies. It just says, we'll tell you if you want this property, you have to pay for it. Government. So why isn't that applicable here? Essentially, Nolan and Dolan both involved tremendous situations in State courts. And the situation was complicated by the fact that the government was requiring a transfer of property without paying for it as a condition of the development. So as Justice Berzon mentioned earlier, the government had already declared essentially in the nature of the context that the property was demanded, that they were not going to be paying for it. They said, we'll give you the permit if you give us this property without us paying for it. Well, here isn't the city's essence saying, if you want your development permit, you have to give us a permanent easement over .9 acres and leave it fallow for mitigation. Absolutely not. And although there's no transfer of a deed, it's in essence that's what the requirement is other than putting aside for the moment the option to buy property elsewhere and to pay fees. I'm glad you raised that point because that's precisely what the city is not doing here. The city is not telling Mr. Meade what he has to do. Mr. Meade has had conversations for a number of years with the wildlife agencies about the potential impacts on the California tiger salamander from his development. It is within a 1.3 miles of a known breeding site of the California tiger salamander. This isn't a hypothetical situation where, gee, there might be some critters nearby. We don't know. We have no idea. This isn't one of those situations. Fish and Wildlife Service has actually mapped out these areas. They've provided the maps to the local governments so they could use them in their CEQA process to inform the decisions. This is within the distance that these animals travel. So it is highly likely his project to impact the California tiger salamander. So when the city went through its process, it said you need to figure out what you need to do to comply with the Endangered Species Act. We're going to go through CEQA. We'll do a mitigated negative declaration, which we can allow you to develop your property sooner, but the only way we can do that is if you take care of this potential impact on the tiger salamander. You can do that in all sorts of ways. You can dedicate property, as the mitigation guidelines say. You can talk to Fish and Wildlife Service, and they have areas where you can pay toward a mitigation bank. You can do a protocol survey, and if you find out that there are no animals on your property, you don't have to do anything at all. So the city has not required them to set so much property aside. The city is simply telling them all of our evidence says that there is a significant impact likely to occur on this endangered species, and you need to figure out whether that's going to happen, and if so, address it. And is what you said then, which I didn't understand previously and may not understand now, that also if he doesn't do that, the only consequence is it's going to take longer to get the permit because they're going to have to do a CEQA statement? Right. We informed Mr. Meade that the only way to do this abbreviated process was to have the impacts on the California tiger salamander mitigated. If he doesn't want to do that, we can go through the process for a full environmental impact report and get to the end result there. The first thing you would do, you're saying you will only not do it if he does one of these mitigations. Precisely. And frankly, he doesn't even necessarily need to mitigate if he can demonstrate that there are no animals on the property. And he could have done protocol surveys any time over the last number of years. He simply has chosen not to do that. But there was some Fish and Wildlife Service finding wasn't there. The Fish and Wildlife Service. And say the risk point is not what he said. Right. I mean, what happened is he asked the Fish and Wildlife Service to simply send him a letter saying this won't impact the tiger salamander. And they sent a representative out to the property to inspect, to see if, in fact, there could be barriers or other things that would have prevented the tiger salamanders from being on his property. And they didn't find any evidence of that. So they told him, you know, based on our just cursory review of your property, it's very likely there are tiger salamanders there just from the proximity to the known breeding sites. So you can do protocol surveys. And if they say there are none, then we'll do a letter saying you're clear. But otherwise, we don't have any evidence to show that they can't be on your property. So that was not necessarily a determinative finding by them. But as a courtesy, they went out there to just see if they could tell him, yeah, there are blockages, there are walls, there's other impediments. For instance, a freeway between the breeding site and the property would be an impediment to the tiger salamander migrating to that place. If they had done a protocol survey, as you said, and found no individuals on the property, then there would have been no mitigation requirement with respect to the California tiger salamander. Correct. Yes. Absolutely. Now, I'd like to get back to the threshold issue, which I think that the threshold issue is that the case is simply not ripe to be reviewed to begin with. The appellant has not satisfied either of the Williamson County ripeness requirements. And the district court found that the first requirement was met. Right. Why not? The district court was convinced that because the appeal window has now closed, that was the definition of finality for purposes of Williamson County. And so the appeal window has closed. He can't now file an appeal, so the decision can't be changed now. And, therefore, it's final. But that's not what Williamson County says. What Williamson County says. That would simply eliminate the whole requirement. Exactly. Williamson County says that a developer must pursue various administrative options and give the city the ability to make determinations, to do waivers, to do whatever they're going to do. You can't simply. For the second prong, where you have to exhaust your state remedies in order to monetize whether you're going to get compensation or not. But the first prong, I think the courts have been careful to say that it's not an exhaustion requirement. It's just whether you get a final decision on your issue. Are you confusing those two prongs? Well, I think, you know, it's a difficult concept because the terminology is so similar. So I don't think I'm confusing the two prongs at all. The first prong is that the decision must be final. And the courts that have interpreted that have said what that means is that if you don't like the first determination, that doesn't make it final. If there is still some other thing that the city can do to allow you to develop your property differently, you must go back to the city and pursue some of those options. You have to appeal. You have to seek a variance. You have to seek some other combination of the project rather than the first one you put forward. And you can't simply say they're not going to let me do just this one thing, therefore I'm going to go and pursue a taking claim. Well, I don't believe the city said that at all. No. Well, the problem is that the appellant in this case just simply chose not to avail himself of the appeal. He chose not to pursue a number of remedies that were available. See, my problem isn't so much that he didn't avail himself of the appeal. It's that he never made his choice among the options, so we don't know what we're dealing with in terms of what, whether there's even anything to be compensated for or arguably to be compensated for. Right. I mean, the appellant could have selected to have the city pursue the environmental impact report. He didn't do that. He could have, under the affordable housing ordinance, there are a whole host of options the appellant could have selected, including design your own option. So he could have chosen to set aside 20 percent of the units. He could have chosen instead to pay an in lieu fee. He could have put forth his own option for how he wanted to comply with the affordable housing ordinance. He could have gone to the city council and made the case that this ordinance is actually going to cause a taking of my property under the federal and California constitutions. And he could have had the condition waived by doing that, but he didn't do any of those things. He says he did ask for a waiver. He asked for a waiver before the planning commission, but he didn't go to the city council. And the ordinance specifically provides that you can take that to the city council and ask for a waiver. And the city council is the highest decision-making body of the city. It's not the planning commission. So he didn't do any of those things. And then the second prong of Williamson County is, of course, that he has to go and avail himself of the State courts to seek compensation, which he has conceded that he has not done. They're not bringing a takings claim per se. They're bringing just the due process, the procedural due process. So that prong is not necessarily required. Well, they're not bringing a procedural due process claim. They're not bringing a due process. What they're trying to do is bring a due process claim but call it a takings claim. That's precisely what they're trying to do. There is no injunctive relief available for a taking. That's not what the Fifth Amendment provides. So how do you explain Nolan and Dolan, both with regard to procedurally and, you know, having been a minute and a half, and with regard to its substantive limitations? Nolan and Dolan presented a unique situation where a developer wanted or, in Nolan's case, they wanted to expand their house. And the governing entity said, in exchange for giving you this permit, you have to give us some interest in your property, an easement, some sort of property interest, you have to convey it to us for our benefit in exchange for the development permit. And in both cases, the property interest the government was asking for was wholly unrelated to the impact of the development. But that's the substance of it, and that we're not going to get into. The question is what standard, whether this is a Nolan-Dolan situation, either procedurally or substantively. This is absolutely not a Nolan-Dolan situation. Those cases involved situations where the government was in negotiations with a single landowner and was exacting, if you will, a condition that was not applied to others. It was only applied to that landowner in the situation of that negotiation. That's true. I also have some problems with this legislative adjudicative thing. I don't understand why that should matter. I understand that perhaps it should matter that they were, what they were looking for there was a direct conveyance of land, which would be a physical invasion taking under any theory. But I don't understand the legislative adjudicatives. Well, basically what the courts have said, including this Court in McClung, was that the difference is when there's a condition that's generally applicable to everyone, then if you have a problem with that condition, it's best left to the legislative process and the democratic process. But we've been told, and it seems right to me, that there was a overall regulation at stake in Nolan, at least, and in the same sense that there is here, i.e., we can require you to dedicate land if you're going to build. So how is that different, though, what goes on here? Well, the first way it's different is that the city is not asking for any land whatsoever. I understand that. That's the point that I think does matter. But I want to know why the legislative adjudicatives matter. I think it goes back again, and there is some question as to whether Nolan truly involved a generally applicative legislative condition. But I don't think there's any question that this situation does. The Affordable Housing Ordinance applies to all new development in the city. It's generally applicable. There's no difference between this landowner and the next landowner and somebody three miles away in the city who wants to develop. It's all spelled out in detail or something. It's all spelled out in great detail, and anybody who wants to come to the city to develop. Why does that have to do with the takings clause? I mean, if they took it or they didn't take it, why does it matter how they took it? Well, I guess that gets back to what test you apply, you know. Penn Central is a test that's generally been applied to all regulatory takings cases, such as this one, where you're saying a regulation had some impact. But this is regulatory, it seems to me, because it isn't, in fact, physically taking land. So that's a different problem. Correct. Anyway. All right. It's a mystery. Thank you very much for your argument. Thank you. I'll just make a couple of points quickly. First is the Williamson County test, the first prong, specifically does not require administrative remedies. What it requires is just a determination as to what you need to do, and we've got that. We have letters attached to the complaint where the city attorney has clearly said, yes, you've got to do this. You know, you're not going to get out of this. You've got to do this if you want your building permit. So it doesn't matter that we don't actually know what the this is? In this particular case, it doesn't, because regardless what the this is, as long as it is going to be... So therefore, we need to take this case on the theory that the this, for example, is paying a fee. Whichever the this is, we don't believe any of the options are sufficiently connected to meet the Nolan Dolan test. And this is not a substantive... But, you see, it makes a difference for the Nolan Dolan test whether this is money or that this is land. So we're to assume that this is money, because we don't know which it is. But, again, it shouldn't. I mean, it's similar to your comment about the legislative, the adjudicative. It shouldn't matter, as long as it's a good decision. But it clearly does matter, doesn't it? I mean, isn't every indication in the case law that Nolan Dolan is about a land exaction and not about any other kind of fee payment or regulation or anything else in the takings world? Well, Your Honor, I respectfully disagree with that, because many of the cases not in this circuit, I agree with you, but in many of the various States, in fact, they do apply, and some circuits do apply Nolan Dolan to fees. Well, what about the comment that is for the California Tigers Alameda case? Your client could have eliminated that by doing a protocol to determine whether there are individuals on the property. Well, Your Honor, my client did hire an expert. His expert did say that there were, for instance, he mentioned the highway, where the Tigers Alameda would not be able to even get to his property. But apparently, for some reason, that study was not sufficient. So there was a study that said there weren't any California Tigers Alamedas that was submitted to the city, and the city didn't say, therefore we don't have any mitigation requirement on your property? They did not. They said that the study – I believe what they said is that the study had to be a much longer, much more involved kind of study. I think it has to go over several seasons to see, you know, whether there's – what the breeding is over a long period of time or something. In this case, Mr. Meade did hire an expert who did look at the property, could find no breeding grounds, could find no salamander themselves, found a number of impediments to the salamander being able to get to the property. So I believe we have a dispute about what was required to demonstrate that. And, again, I don't think this – I don't think with the record we have that this whether it's sufficiently connected. This was on a motion to dismiss. I mean, I think we have to get evidence to prove that. The court could decide that the government didn't provide sufficient evidence because it is the government's burden, but that issue could also be remanded, which is why I said I think this court really hinges on the ripeness issue. And as far as the second prong for Williamson County, we couldn't go back to – we couldn't go to State court to exhaust – get compensation because, as I said, there are no damages. We have nothing to go back and seek from the State court. And that's the problem intrinsic to these kinds of exactions that are put on the permits to develop. Well, why is that any different than any other kind of regulation? I mean, this regulation is you have to pay a certain amount of money or you have to do a certain study. I mean, that's how we have to look at the case, because since you haven't made a choice, it seems to me the land use – the land dedication issues are out. So looking at it that way, how is it different from all the other regulatory taking cases where the basic rule is you have to comply and or – and then seek compensation? Because, Your Honor, the other tests look at the denial of use of property, Lucas test, whether you've been denied all economically viable use of your property. At the time of the denial, you know what you've been denied and you can go seek compensation. Under Penn Central, it's a matter of, you know, what the economic interests are and that kind of thing, but you know what you've been denied and you can go seek compensation. Here, the damages don't occur until the property owner takes an affirmative act to meet the conditions that are imposed, until Mr. Meade either builds those units for affordable housing or until he pays the fee. That is the distinction. That's how the Nolan Dolan case differs from the other takings cases.  Thank you very much, Your Honor, for your time. Thank both of you for your arguments and an interesting case. Meade v. City of Cotati is submitted.
judges: Goodwin, Berzon, Ikuta